# ORIGINAL

## IN THE COURT OF COMMON PLEAS
## HAMILTON COUNTY, OHIO
## CIVIL DIVISION

**MARY ZUREICK**
7515 US Highway 42, Apt. #5
Florence, KY 41042

   **Plaintiff,**

v.

**ABUBAKAR ATIQ DURRANI, M.D.**
PAKISTAN
(Serve via Hague Convention)

And

**CENTER FOR ADVANCED SPINE TECHNOLOGIES, INC.**
6905 BURLINGTON PIKE
FLORENCE, KY 41042

Serve: CT Corporation System  **REGULAR MAIL WAIVER**
1300 East 9th St. Ste 1010
Cleveland, OH 44114
(Serve via Certified mail)

And

**JOURNEY LITE OF CINCINNATI, LLC**
10475 READING RD., SUITE 115
CINCINNATI, OH 45241  **REGULAR MAIL WAIVER**

SERVE: CT CORPORATION SYSTEM
1300 EAST NINTH STREET
CLEVELAND, OH 44114
(Serve via Certified mail)

   **Defendants.**

Case No. A1400581

Judge

**COMPLAINT & JURY DEMAND**



FILED 2014 JAN 31 P 1:39
TRACY WINKLER
CLERK OF COURTS
HAMILTON COUNTY, OH



D105075003 INI

1

Comes now Plaintiff, Mary Zureick, and files this Complaint and jury demand, stating as follows:

## FACTUAL ALLEGATIONS OF PLAINTIFF

1. At all times relevant, Mary Zureick ("Plaintiff") was a resident of and domiciled in the State of Kentucky.

2. At all times relevant, Defendant Dr. Abubakar Atiq Durrani ("Dr. Durrani") was licensed to and did in fact practice medicine in the State of Ohio.

3. At all times relevant, Center for Advanced Spine Technologies, Inc. ("CAST") was licensed to and did in fact perform medical services in the State of Ohio and Kentucky, and was and is a corporation authorized to transact business in the State of Ohio and Kentucky.

4. At all times relevant, Journey Lite of Cincinnati, LLC ("Journey Lite") was a Delaware corporation transacting business and performing and managing medical services in the State of Ohio and held itself out to the public, and specifically to Plaintiff as a center providing competent and qualified medical and nursing services, care and treatment by and through its physicians, physicians in training, residents, nurses, agents, ostensible agents, servants and/or employees.

5. The amount in controversy exceeds the jurisdictional threshold of this Court.

6. The subject matter of the Complaint arises out of medical treatment by the Defendants in Hamilton County, Ohio. This Court is thus the proper venue to grant Plaintiff the relief she seeks.

7. In July of 2012, Plaintiff began experiencing pain in her groin and right knee for

2

which she sought treatment from her primary care physician and an orthopedic specialist.

8. After about five weeks of aquatic therapy, Plaintiff's pain level did not decrease, and she was therefore directed to consult a spine surgeon.

9. On January 15, 2013, Plaintiff attended an initial consultation with Dr. Durrani at CAST.

10. During this consultation, Dr. Durrani reviewed Plaintiff's recent MRI and immediately recommended a two-part operation consisting of a lumbar laminectomy at L1-2 and extension of the L1-2 fusion, as well as a lumbar hemilaminectomy, foraminotomy, and decompression at L3-4 and L5-S1 bilaterally.

11. Dr. Durrani's interpretation of Plaintiff's spinal MRI on which he based his decision to operate on Plaintiff is significantly different than that of the radiologist. Specifically, unlike Dr. Durrani, the radiologist found neither a disk herniation nor "very significant" foraminal stenosis at L5-S1.

12. Plaintiff completed a CT scan on February 13, 2013, ordered by Dr. Durrani. Once again, Dr. Durrani's interpretation of this scan was much different than the radiologist's, in that Dr. Durrani found her condition to be much worse.

13. On March 1, 2013, Dr. Durrani performed a lumbar laminectomy at L1-2, bilateral foraminotomy at L1-2, posterior spine instrumentation and fusion at L1-2, and a posterior spine instrumentation at L1-2 with extension of fusion.

14. Additionally, during the March 1, 2013 surgery, Dr. Durrani removed an L2 screw, however, neither the CT scan nor the MRI indicated a loose screw.

15. Upon information and belief, during this surgery, Dr. Durrani used Infuse/BMP-2

3

or Puregen, without Plaintiff's knowledge or consent, causing Plaintiff harm.

16. Following the surgery, to Plaintiff's surprise, the pain in her back, groin, and knee exacerbated.

17. Plaintiff continued treating with Dr. Durrani and CAST until her initial post-operative evaluation on March 12, 2013.

18. Upon information and belief, the surgery performed by Dr. Durrani was medically unnecessary and/or improperly performed.

19. As a direct and proximate result of Dr. Durrani's treatment, Plaintiff has suffered harm.

## INFUSE/BMP-2

20. Dr. Durrani oftentimes used BMP-2 "off-label" when performing surgeries.

21. BMP-2 is manufactured, marketed, sold and distributed by Medtronic under the trade name "Infuse."

22. Dr. Durrani is a consultant for Medtronic.

23. Defendants did not inform Plaintiff of Durrani's financial interest, conflicts of interest or consulting arrangement with Medtronic.

24. Medtronic, provided in writing to Dr. Durrani and CAST the approved uses for BMP-2, the substance also referred to as Infuse, which is a bone morphogenic protein, used as an artificial substitute for bone grafting in spine surgeries.

25. BMP-2 is not approved by the Food and Drug Administration for use in the cervical and thoracic spine.

26. BMP-2 is neither safe nor approved for use on children less than twenty one (21) years of age.

4

27. For use in spinal surgery, BMP-2/Infuse is approved by the FDA for a limited procedure, performed on a limited area of the spine, using specific components. Specifically, the FDA approved Infuse for one procedure of the spine: Anterior Lumbar Interbody Fusion ("ALIF" or "Anterior" approach); and only in one area of the spine: L4 to S1; and only when used in conjunction with FDA-Approved Components: LT-CAGE Lumbar Tapered Fusion Device Component ("LT-CAGE")

28. Use of Infuse in cervical or thoracic surgery, or use through the back (posterior), or side (lateral), or on areas of the spine outside of the L4-S1 region (e.g., the cervical spine), or using components other than or in addition to the LT-CAGE is not approved by the FDA, and thus such procedures and/or use of non-FDA approved componentry is termed "off-label."

29. When used off-label, Infuse frequently causes excessive or uncontrolled (also referred to as "ectopic" or "exuberant") bone growth on or around the spinal cord. When nerves are compressed by such excessive bone growth, a patient can experience, among other adverse events, intractable pain, paralysis, spasms, and cramps in limbs.

30. The product packaging for BMP-2/Infuse indicates it causes an increased risk of cancer four (4) times greater than other bone graft alternatives.

31. Dr. Durrani, CAST staff and employees, and Journey Lite personnel did not disclose to Plaintiff their intent to use BMP-2/Infuse, and further, did not disclose their intent to use BMP-2/Infuse in a way not approved by the FDA.

32. Dr. Durrani used BMP-2 in Plaintiff in manners not approved by Medtronic or the FDA.

5

33. Plaintiff was not informed by Dr. Durrani that Dr. Durrani used Infuse/BMP-2 in their surgery.

34. Plaintiff would not have allowed BMP-2 to be used by Dr. Durrani in their surgery(ies) in a manner that was not approved by the FDA or Medtronic, Infuse/BMP-2's manufacturer.

35. Plaintiff would not have consented to the use of BMP-2 in her body if informed of the risks by Dr. Durrani, CAST staff and employees, or any Journey Lite personnel.

36. The written informed consent of Dr. Durrani and CAST signed by Plaintiff lacked the disclosure of Infuse/BMP-2's use in their procedure(s).

37. Plaintiff never received a verbal disclosure of Infuse/BMP-2 from Dr. Durrani, CAST staff and employees, or any Journey Lite personnel.

38. Medtronic specifically required Infuse/BMP-2 only be used in "skeletally mature patients" with degenerative disc disease.

39. Medtronic required at least six (6) months of non-operative treatment prior to use of Infuse/BMP-2.

40. Dr. Durrani regularly used Infuse/BMP-2 without this six (6) month non-operative treatment.

41. Medtronic required BMP-2 always be used in conjunction with a metal LT cage.

42. Dr. Durrani regularly used BMP-2 without a proper LT cage in his surgeries.

## PUREGEN

43. Dr. Durrani oftentimes used Puregen when performing surgeries.

44. Puregen is a product produced by Alphatec Spine.

45. Dr. Durrani was and is a paid consultant for Alphatec Spine.

6

46. Dr. Durrani has an ownership stake in the Alphatec Spine.

47. Puregen has never been approved by the FDA for any human use.

48. Puregen is now removed from the market for any use.

49. Dr. Durrani used the product Puregen as bone graft substitute similar to Infuse/BMP-2 during spinal surgeries.

50. Dr. Durrani, CAST staff and employees and Journey Lite personnel did not disclose their intent to use Puregen, nor did they inform Plaintiff that it was a product that was not approved by the FDA for human use.

51. Dr. Durrani used Puregen in Plaintiff in manners not approved by the FDA.

52. Plaintiff was not informed by Dr. Durrani, CAST staff and employees or any Journey Lite personnel that Dr. Durrani used Puregen in their surgery.

53. Plaintiff would not have allowed Puregen to be used by Dr. Durrani in their surgery(ies) in a manner that was not approved by the FDA.

54. Plaintiff would not have consented to the use of Puregen in their body if informed of the risks by Dr. Durrani, CAST staff and employees, or any Journey Lite personnel.

55. The written informed consent of Dr. Durrani and CAST signed by Plaintiff lacked the disclosure of Puregen's use in their procedure(s).

56. Plaintiff never received a verbal disclosure of Puregen from Dr. Durrani, CAST staff and employees, or any Journey Lite personnel.

## DR. DURRANI COUNTS:

## COUNT I: NEGLIGENCE

57. Defendant Dr. Durrani owed his patient, Plaintiff, the duty to exercise the degree

7

of skill, care, and diligence an ordinarily prudent health care provider would have exercised under like or similar circumstances.

58. Defendant Dr. Durrani breached his duty by failing to exercise the requisite degree of skill, care and diligence that an ordinarily prudent health care provider would have exercised under same or similar circumstances through, among other things, negligent diagnosis, medical mismanagement and mistreatment of Plaintiff, including but not limited to improper selection for surgery, improper performance of the surgery, and improper follow-up care addressing a patient's concerns.

59. As a direct and proximate result of the aforementioned negligence and deviation from the standard of care on the part of the Defendant Dr. Durrani, Plaintiff sustained severe and grievous injuries, prolonged pain and suffering, emotional distress, humiliation, discomfort, loss of enjoyment of life, and loss of ability to perform usual and customary activities and incurred substantial medical expenses and treatment.

## COUNT II: BATTERY

60. Dr. Durrani committed battery against Plaintiff by performing a surgery that was unnecessary, contraindicated for Plaintiff's medical condition, and for which he did not properly obtain informed consent, inter alia, by using BMP-2, PureGen and/or Baxano in ways and for surgeries not approved by the FDA and medical community, and by the failure to provide this information to Plaintiff.

61. Plaintiff would not have agreed to the surgeries if they knew the surgery(ies) was/were unnecessary, not approved by the FDA, and not indicated.

62. As a direct and proximate result of the aforementioned battery by Dr. Durrani, Plaintiff sustained severe and grievous injuries, prolonged pain and suffering,

emotional distress, humiliation, discomfort, loss of enjoyment of life, loss of the ability to perform usual and customary activities, and incurred substantial medical expenses and treatment.

### COUNT III: LACK OF INFORMED CONSENT

63. The informed consent forms from Dr. Durrani and CAST which they required Plaintiff to sign failed to fully cover all the information necessary and required for the procedures and surgical procedures performed by Dr. Durrani. Dr. Durrani and CAST each required an informed consent release.

64. In addition, no one verbally informed Plaintiff of the information and risks required for informed consent at the time of or before Plaintiff's surgery.

65. Dr. Durrani failed to inform Plaintiff of material risks and dangers inherent or potentially involved with their surgery(ies) and procedures.

66. Plaintiff subsequently developed severe and grievous injuries as a direct and proximate result of lack of informed consent.

67. Had Plaintiff been appropriately informed of the need or lack of need for surgery and other procedures and the risks of the procedures, Plaintiff would not have undergone the surgery or procedures.

### COUNT IV: INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

68. Dr. Durrani's conduct as described above was intentional and reckless.

69. It is outrageous and offends against the generally accepted standards of morality.

70. It was the proximate and actual cause of Plaintiff's psychological injuries, emotional injuries, mental anguish, suffering, and distress.

9

71. Plaintiff suffered severe distress and anguish so serious and of a nature that no reasonable man or woman would be expected to endure.

### COUNT V: FRAUD

72. Dr. Durrani made material, false representations to Plaintiff and their insurance company related to Plaintiff's treatment including: stating the surgeries were necessary, that Dr. Durrani "could fix" Plaintiff, that more conservative treatment was unnecessary and futile, that the surgery would be simple or was "no big deal", that Plaintiff would be walking normally within days after each surgery, that the procedures were medically necessary and accurately reported on the billing to the insurance company, that the surgery was successful, and that Plaintiff was medically stable and ready to be discharged.

73. Dr. Durrani also concealed the potential use of Infuse/BMP-2 and/or Puregen in Plaintiff's surgery when he had a duty to disclose to Plaintiff his planned use of the same.

74. These misrepresentations and/or concealments were material to Plaintiff because they directly induced Plaintiff to undergo her surgery.

75. Dr. Durrani knew or should have known such representations were false, and/or made the misrepresentations with utter disregard and recklessness as to their truth that knowledge of their falsity may be inferred.

76. Dr. Durrani made the misrepresentations both before, during and after the surgery(ies) with the intent of misleading Plaintiff and their insurance company into relying upon them. Specifically, the misrepresentations were made to induce payment by the insurance company, without which Dr. Durrani would not have performed the

surgery(ies), and to induce Plaintiff to undergo the surgery(ies) without regard to medical necessity and only for the purpose of receiving payment.

77. The misrepresentations and/or concealments were made during Plaintiff's office visits at Dr. Durrani's CAST offices.

78. Plaintiff was justified in their reliance on the misrepresentations because a patient has a right to trust their doctor and that the facility is overseeing the doctor to ensure the patients of that doctor can trust the facility.

79. As a direct and proximate result of the aforementioned fraud, Plaintiff did undergo surgery(ies) which were paid for in whole or in part by their insurance company, and suffered severe and grievous injuries, paralysis, new and different pain, prolonged pain and suffering, emotional distress, humiliation, discomfort, loss of enjoyment of life, loss of ability to perform usual and customary activities, and incurred substantial medical expenses and treatment.

## COUNT VI: SPOLIATION OF EVIDENCE

80. Dr. Durrani willfully altered, destroyed, delayed, hid, modified and/or spoiled ("spoiled") Plaintiff's records, billing records, paperwork and related evidence.

81. Dr. Durrani spoiled evidence with knowledge that there was pending or probable litigation involving Plaintiff.

82. Dr. Durrani's conduct was designed to disrupt Plaintiff's potential and/or actual case, and did in fact and proximately cause disruption, damages and harm to Plaintiff.

## CAST COUNTS:

## COUNT I: VICARIOUS LIABILITY

83. At all times relevant, Defendant Dr. Durrani was an agent, and/or employee of CAST.

84. Dr. Durrani is in fact, the owner of CAST.

85. Defendant Dr. Durrani was performing within the scope of his employment with CAST during the care and treatment of Plaintiff.

86. Defendant CAST is responsible for harm caused by acts of its employees for conduct that was within the scope of employment under the theory of respondeat superior.

87. Defendant CAST is vicariously liable for the acts of Defendant Dr. Durrani alleged in this Complaint including all of the counts asserted against Dr. Durrani directly.

88. As a direct and proximate result of Defendant CAST's acts and omissions, Plaintiff sustained severe and grievous injuries, prolonged pain and suffering, emotional distress, humiliation, discomfort, loss of enjoyment of life, and loss of ability to perform usual and customary activities and incurred substantial medical expenses and treatment.

## COUNT II: NEGLIGENT HIRING, RETENTION, SUPERVISION & CREDENTIALING

89. CAST provided Dr. Durrani, inter alia, financial support, control, medical facilities, billing and insurance payment support, staff support, medicines, and tangible items for use on patients.

90. CAST and Dr. Durrani participated in experiments using BMP-2 and/or Puregen bone graft on patients, including Plaintiff, without obtaining proper informed consent thereby causing harm to Plaintiff.

91. CAST breached its duty to Plaintiff, inter alia, by not controlling the actions of Dr. Durrani and the doctors, nurses, staff, and those with privileges, during the medical treatment of Plaintiff at CAST.

92. The Safe Medical Device Act required entities such as CAST to report serious injuries, serious illnesses, and deaths related to failed medical devices to the FDA and the manufacturer; this was never done.

93. Such disregard for and violations of federal law represents strong evidence that CAST negligently hired, retained, supervised and granted privileges to Dr. Durrani.

94. As a direct and proximate result of the acts and omissions herein described, including but not limited to failure to properly supervise medical treatment by Dr. Durrani, Plaintiff sustained severe and grievous injuries, prolonged pain and suffering, emotional distress, humiliation, discomfort, loss of enjoyment of life, loss of the ability to perform usual and customary activities, and incurred substantial medical expenses and treatment.

## COUNT III: SPOLIATION OF EVIDENCE

95. CAST, through its agents and employees, willfully altered, destroyed, delayed, hid, modified and/or spoiled ("spoiled") Plaintiff's records, billing records, paperwork and related evidence.

96. CAST, through its agents and employees, spoiled evidence with knowledge that there was pending or probable litigation involving Plaintiff.

97. CAST's conduct was designed to disrupt Plaintiff's potential and/or actual case, and did in fact and proximately cause disruption, damages and harm to Plaintiff.

## JOUNREY LITE OF CINCINNATI, LLC COUNTS:

## COUNT I: VICARIOUS LIABILITY

98. At all times relevant, Defendant Dr. Durrani was an agent, apparent agent, and/or employee of Journey Lite.

99. Dr. Durrani is in fact, a partial owner or shareholder of Journey Lite.

100. Defendant Dr. Durrani was performing within the scope of his agency, real or apparent with Journey Lite during the care and treatment of Plaintiff.

101. Defendant Journey Lite is responsible for harm caused by acts of its agents and apparent agents for conduct that was within the scope of agency under the theory of respondeat superior.

102. Defendant Journey Lite is vicariously liable for the acts of Defendant Dr. Durrani alleged in this Complaint including all of the counts asserted against Dr. Durrani directly.

103. As a direct and proximate result of Defendant Journey Lite's acts and omissions, Plaintiff sustained severe and grievous injuries, prolonged pain and suffering, emotional distress, humiliation, discomfort, loss of enjoyment of life, and loss of ability to perform usual and customary activities and incurred substantial medical expenses and treatment.

## COUNT II: NEGLIGENT CREDENTIALING & RETENTION

104. As described in the Counts asserted directly against Dr. Durrani, the actions of Dr. Durrani with respect to Plaintiff constitute physician negligence and medical malpractice.

105. Journey Lite negligently credentialed and retained Dr. Durrani as a credentialed physician by:

   a. Allowing Dr. Durrani to repeatedly violate the Journey Lite bylaws with it's full knowledge of the same;

14

    b. Failing to adequately review, look into, and otherwise investigate Dr. Durrani's educational background, work history and peer reviews when he applied for privileges at Journey Lite;

    c. Ignoring complaints about Dr. Durrani's treatment of patients reported to it by Journey Lite staff, Dr. Durrani's patients and by others;

    d. Ignoring Dr. Durrani's previous privilege terminations from other Cincinnati area hospitals, including Children's Hospital, Deaconess Hospital, Good Samaritan Hospital, Christ Hospital and West Chester Hospital.

106. The Safe Medical Device Act required entities such as Journey Lite to report serious injuries, serious illnesses, and deaths related to failed medical devices to the FDA and the manufacturer; this was never done.

107. Such disregard for and violations of federal law represents strong evidence that Journey Lite negligently granted and retained privileges for Dr. Durrani.

108. As a direct and proximate result of the negligent credentialing and retention of Dr. Durrani, Plaintiff sustained severe and grievous injuries, prolonged pain and suffering, emotional distress, humiliation, discomfort, loss of enjoyment of life, and loss of ability to perform usual and customary activities and incurred substantial medical expenses and treatment that Plaintiff would not otherwise have incurred had Dr. Durrani not been credentialed by Journey Lite.

## COUNT III: FRAUD

109. Journey Lite sent out billing to Plaintiff at their home following their surgery(ies) at Journey Lite.

110. The exact dates these medical bills were sent out are reflected in those medical bills.

111. These bills constituted affirmative representations by Journey Lite that the charges related to Plaintiff's surgery were medically appropriate and properly documented.

112. The bills were sent with the knowledge of Journey Lite that in fact Plaintiff's surgery was not appropriately billed and documented and that the service rendered at Journey Lite associated with Dr. Durrani was not appropriate.

113. The bills sent by Journey Lite to Plaintiff's falsely represented that Plaintiff's surgery was appropriately indicated, performed and medically necessary in contra-indication of the standard of care.

114. Plaintiff relied on the facility holding Dr. Durrani out as a surgeon and allowing him to perform surgeries at its health care facility as assurance the facility was overseeing Dr. Durrani, vouching for his surgical abilities, and further was appropriately billing Plaintiff for Journey Lite's services in association with Dr. Durrani's surgery(ies).

115. As a direct and proximate result of this reliance on the billing of Journey Lite, Plaintiff incurred medical bills that they otherwise would not have incurred.

116. Journey Lite also either concealed from Plaintiff that Infuse/BMP-2 or Puregen would be used in Plaintiff's surgery, or misrepresented to Plaintiff the nature and necessity of the surgery and the particular risks that were involved therein.

117. Journey Lite's concealments and misrepresentations regarding Infuse/BMP-2 or Puregen and the nature, necessity, and risks of Plaintiff's surgery/ies were material facts.

118. Because of its superior position and professional role as a medical service provider, Journey Lite had a duty to disclose these material facts to Plaintiff and a duty to refrain from misrepresenting such material facts to Plaintiff.

119. Journey Lite intentionally concealed and/or misrepresented said material facts with the intent to defraud Plaintiff in order to induce Plaintiff to undergo the surgery, and thereby profited from the surgeries and procedures Dr. Durrani performed on Plaintiff at Journey Lite.

120. Plaintiff was unaware that Infuse/BMP-2 or Puregen would be used in Plaintiff's surgery and therefore, was unaware of the health risks of Infuse/BMP-2 or Puregen's use in Plaintiff's spine.

121. Had Plaintiff known before Plaintiff's surgery/ies that Infuse/BMP-2 or Puregen would be used in Plaintiff's spine and informed of the specific, harmful risks flowing therefrom, Plaintiff would not have undergone the surger/ies with Dr. Durrani at Journey Lite.

122. As a direct and proximate result of Journey Lites' concealments and/or misrepresentations regarding Infuse/BMP-2 or Puregen, and the nature and necessity

of the surgery/ies performed by Dr. Durrani at Journey Lite, Plaintiff sustained, inter alia, economic, and non-economic (including physical, emotional) damages.

## COUNT IV: SPOLIATION OF EVIDENCE

123. Journey Lite through its agents and employees, willfully altered, destroyed, delayed, hid, modified and/or spoiled ("spoiled") Plaintiff's records, billing records, paperwork and related evidence.

124. Journey Lite through its agents and employees, spoiled evidence with knowledge that there was pending or probable litigation involving Plaintiff.

125. Journey Lite's conduct was designed to disrupt Plaintiff's potential and/or actual case, and did in fact and proximately cause disruption, damages and harm to Plaintiff.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff requests and seeks justice in the form and procedure of a jury, verdict and judgment against Defendants on all claims for the following damages:

1. Past medical bills;
2. Future medical bills;
3. Lost income and benefits;
4. Lost future income and benefits;
5. Loss of ability to earn income;
6. Past pain and suffering;
7. Future pain and suffering;
8. Plaintiff seeks a finding that their injuries are catastrophic under Ohio Rev. Code §2315.18;

18

9. All incidental costs and expenses incurred as a result of their injuries;

10. The damages to their credit as a result of their injuries;

11. Punitive damages;

12. Costs;

13. Attorneys' fees;

14. Interest;

15. All property loss;

16. All other relief to which they are entitled including O.R.C. 1345.01

Based upon 1-17 itemization of damages, the damages sought exceed the minimum jurisdictional amount of this Court and Plaintiff seeks in excess of $25,000.

Respectfully Submitted,

/s/ Debra A. Nelson
Debra Nelson (# 0077538)
Attorney for Plaintiff
5247 Madison Pike
Independence, KY 41051
859-363-1900 Fax: 859-363-1444
dnelson@ericdeters.com

## JURY DEMAND

Plaintiff makes a demand for a jury under all claims.

/s/ Debra A. Nelson
Debra Nelson (# 0077538)